## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACKIE L. SULLIVAN, Executrix of the Estate of JOHN L. SULLIVAN, deceased, and widow in her own right, | § § § § | **Civil Action No.:  2:18-cv-03622-GEKP** |
| Plaintiffs, | § § | **Removed from the Court of Common Pleas of Philadelphia County** |
| vs. | § § | **Civil Action No. 1807-2918** |
| BATH IRON WORKS, et al. | § § | |
| Defendants. | | |

### DEFENDANTS BATH IRON WORKS CORPORATION AND GENERAL DYNAMICS CORPORATION JOINDER OF REMOVAL AND INDEPENDENT NOTICE OF REMOVAL PURSUANT TO 28 U.S.C.§§ 1442 AND 1446

PLEASE TAKE NOTICE that Defendants BATH IRON WORKS CORPORATION ("BIW") and GENERAL DYNAMICS CORPORATION ("General Dynamics") (collectively "Defendants") hereby join in the removal by Defendant Huntington Ingalls Incorporated of the above-captioned action from Court of Common Pleas of Philadelphia County under Civil Action No. 1807-2918 pursuant to the federal officer jurisdiction conferred by 28 U.S.C. §§ 1442 and 1446.[1]  Furthermore, Defendants assert their rights to independently remove this matter to this Court from the Court of Common Pleas of Philadelphia County under Civil Action No. 1807-2918 pursuant to 28 U.S.C. §§ 1442 and 1446.[2]

---

[1] On August 28, 2018, Defendant Viad Corporation f/k/a Dial Corporation also filed a Notice of Removal in this matter, which was assigned Civil Action No. 2:18-cv-3685.

[2] Defendants state that in filing this notice, Defendants expressly reserve and do not waive their right to move for summary judgment based on successor liability principles and/or to otherwise assert that a separate and distinct entity holds the relevant assets and liabilities in this action.  Defendants further state that by virtue of filing this notice, Defendants do not concede that they are the entity responsible for Mr. Sullivan's alleged asbestos exposure.

## PROCEDURAL HISTORY

1.      On or about July 25, 2018, Plaintiffs, Jackie L. Sullivan, as Executrix of the Estate of John L. Sullivan, deceased, and Jackie L. Sullivan, as widow in her own right, filed this asbestos personal injury action against a number of defendants, including BIW and General Dynamics, in the Court of Common Pleas of Philadelphia County under Civil Action No. 1807-2918.  A copy of Plaintiffs' Complaint is annexed hereto as **Exhibit A**.

2.      Plaintiffs' Complaint alleges, *inter alia*, that Mr. Sullivan was exposed to asbestos during his service with the United States Navy ("Navy") beginning October 18, 1967.   The Complaint alleges that Mr. Sullivan was assigned to the following vessels:

-   USS Norfolk (DL-1):  January 7, 1968 to September 27, 1968;

-   USS Biddle (DL-6-34):  January 8, 1969 to August 8, 1969; and

-   USS Lexington:  January 31, 1970 to June 14, 1971; June 25, 1971 to February 4, 1972.

Id. at ¶ 6 (b).

3.      It is further alleged that, from February 5, 1972 to December 31, 1972, Mr. Sullivan served in the United States Naval Reserves as a machinist mate.  Id. at ¶ 6 (c).

4.      On January 2, 1973, Mr. Sullivan is alleged to have re-entered the Navy and been assigned to the USS Blakely (DE-1072).  Id. at ¶ 6 (d).  He was then allegedly assigned to the USS Saratoga from 1975 to 1976 after its overhaul at the Philadelphia Navy Yard.   Id. Plaintiffs' Complaint alleges that Mr. Sullivan breathed asbestos dust released during the overhaul that was still present in the air of the engine and fire rooms, which caused his lung cancer.  Id.

5.      From 1977 to January 10, 1980, Mr. Sullivan was allegedly assigned to the USS Charles Adams, including one year when the vessel was repaired at the Philadelphia Navy Yard. Id. at ¶ 6 (e).  Mr. Sullivan was allegedly involved in asbestos removal and installation.  Id. During this process, Mr. Sullivan allegedly inhaled asbestos being released from pipes, covering, compressors, turbines, boilers and valves on the ship in the Philadelphia Navy Yard.  Id.

6.      Mr. Sullivan also alleges unspecified asbestos exposure while working at a gas station in Missouri.  Id. at ¶ 6 (a).

7.      On or about September 2, 2016, Mr. Sullivan was allegedly diagnosed with lung cancer as a result of his asbestos exposure.  Id. at ¶ 13.

8.      Plaintiffs' Complaint alleges that BIW built and repaired ships that were intended and designed to be insulated with asbestos.  Id. at ¶ 10 (d).  It also alleges that BIW knew that its ships, including the USS Adams, would be repaired at the Philadelphia Navy Yard.  Id. Plaintiff's Complaint alleges that Mr. Sullivan's exposure to this asbestos caused his lung cancer. Id.  While not specifically addressed in Plaintiffs' Complaint, BIW also built the USS Biddle (DL-6-34) where Mr. Sullivan served from January 8, 1969 to August 8, 1969.

9.      Plaintiffs' Complaint alleges that General Dynamics owned the Fore River Shipyard, which built the USS Lexington.  Id. at ¶ 10 (n).[3]  It also alleges that General Dynamics's predecessor, "Fore River," designed, intended and knew that the USS Lexington contained asbestos.  Id.

---

[3] General Dynamics did not own the Fore River Shipyard during the period the USS Lexington was constructed.  Its predecessor, Bethlehem Steel Corporation, from whom General Dynamics acquired the Fore River Shipyard, performed work at the Fore River Shipyard pursuant to military contracts.  General Dynamics asserts that a separate and distinct entity other than General Dynamics holds the relevant assets and liabilities in this action.

10.     BIW was served with the Complaint on or about July 31, 2018, which is the commencement date of the action against BIW.  A copy of the Service of Process of Plaintiffs' Complaint is annexed hereto as **Exhibit B**.

11.     General Dynamics was served with the Complaint on or about July 31, 2018, which is the commencement date of the action against General Dynamics.  A copy of the Service of Process of Plaintiffs' Complaint is annexed hereto as **Exhibit C**.

12.     On or about August 22, 2018, Defendant Huntington Ingalls Incorporated filed their Notice of Removal under 28 U.S.C. §§ 1442 and 1446.

## THE INSTANT NOTICE OF REMOVAL IS TIMELY FILED

13.     It is settled law that an "initial pleading" may trigger the running of the thirty (30) day limitations period of the removal statute, if said pleading provides information from which a defendant can ascertain removability.  See 28 U.S.C. § 1446(b).

14.     Accordingly, this Notice of Removal is timely by Defendants as required by 28 U.S.C. § 1446(b) as it is being filed within thirty (30) days after receipt of the initial pleading setting forth the claim for relief upon which such action or proceeding is based.

## INTRA DISTRICT ASSIGNMENT

15.     This Notice of Removal and all exhibits are being filed in the United States District Court for the district and division in which the state court action is pending.  See 28 U.S.C. § 1446(a).  Defendants reserve the right to move this Court for transfer to another district.

## ARGUMENT

### I.   Federal Officer Removal Is Appropriate Under 28 U.S.C. §1442(a)(1)

16.     Removal is proper under 28 U.S.C. § 1442(a)(1) when the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof, is sued in an official capacity for any act under color of such office.  See 28 U.S.C. §1442(a)(1).

17.     This statute overcomes the well-pleaded complaint rule by providing a method to remove a case brought in state court against a federal officer, or any other person acting under a federal officer, despite the absence of a federal cause of action.  See Nesbiet v. General Elec. Co., 399 F. Supp.2d 205, 209 (S.D.N.Y. 2005); Jefferson County v. Acker, 527 U.S. 423, 431 (1999).  The Supreme Court has noted that one of the purposes of the federal officer removal statute is to ensure that a federal court will adjudicate the validity of a defendant's official immunity defenses. See Arizona v. Manypenny, 451 U.S. 232, 242 (1981).

18.     The allegations that Mr. Sullivan was exposed to asbestos on the USS Adams, USS Biddle, and USS Lexington, all of which were U.S. Navy vessels, gives rise to Defendants' federal defenses.  Each piece of equipment installed on Navy vessels had to be manufactured to detailed Navy specifications designed to ensure the safety, reliability, maintainability, and operability of shipboard equipment.   See Affidavit of Retired Commander James Delaney, annexed hereto as **Exhibit D** at ¶19.  The Navy dictated all aspects of the design requirements and materials for construction of products used on its vessels.  Id.  Navy specifications addressed the use of asbestos-containing insulation and asbestos-containing parts for equipment to be installed on Navy vessels.  Id.  Such Navy specifications were established either by the Navy itself or through the Navy's process of approving contractor designs and submittals only after a thorough

and meaningful Navy review.  Id.  Based on the Navy's requirements and protocols, any asbestos-containing materials used on Navy vessels were explicitly required by the Navy specifications.  Id..  The Navy would have rejected products that did not conform to its specifications.  Id.  In short, any asbestos used on the USS Lexington, USS Adams and USS Biddle was designed, specified, mandated, manufactured for or supplied for use by the Navy pursuant to its specifications and requirements.  Id. at ¶24

19.     Moreover, in their role as government contractors, Defendants were in the business of assembly, overhaul, repair and maintenance of military vessels on behalf of the Navy in accordance with applicable military specifications.  Id. at ¶25.  This assembly and/or maintenance work was specified and overseen by the Navy and required the approval of the Navy at every stage of construction or overhaul.  Id. at ¶26-29.

20.     Accordingly, Defendants are entitled to remove this case.

### A. Defendants Meet The Four Elements For Removal Under The Federal Officer Statute

21.     The federal officer statute, specifically 28 U.S.C. § 1442(a)(1), allows private defendants to remove cases.  In such cases, federal jurisdiction exists if the defendant seeking removal shows that: (1) it is a person within the meaning of the statute; (2) it acted pursuant to federal officer's directions; (3) there is a causal nexus between [its] actions under color of federal office and the plaintiff's claims; and (4) it has a colorable federal defense.  Zeringue v. Crane Co., 846 F.3d 785, 789 (5th Cir. 2017); see also, Madden v. Able Supply Co., 205 F.Supp. 2d 695, 699 (S.D. Tex. 2002); Mesa v. California, 489 U.S. 121, 123-35 (1989); Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 397-201 (5th Cir. 1998), cert. denied, 526 U.S. 1034 (1999); Isaacson v. Dow Chemical Co., 517 F.3d 129 (2d Cir. 2008).

22.     The Supreme Court has instructed that a defendant must "show a nexus, 'a causal connection between the charged conduct and asserted official authority.'" Jefferson Cty., Ala. v. Acker, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999) (quoting Willingham v. Morgan, 395 U.S. 402, 409 (1969)).  Until 2011, 28 U.S.C. § 1442(a)(1) required a showing that a defendant had been sued "for any act under color of [federal] office.  The statute was revised in 2011 to include the words "or relating to."  This amendment intended to "broaden the universe of acts that enable Federal officers to remove [suits] to Federal court."  H.R. Rep. No. 112-17, pt. 1, at 6 (2011).  Accordingly, the Third Circuit has "taken a more permissive view of this requirement.  Specifically, [it] ha[s] held that, in order to meet the 'for or relating to' requirement, it is sufficient for there to be a connection or association between the act in question and the federal office."  Papp v. Fore-Kast Sales Co., 842 F.3d. 805, 813 (3rd Cir. 2016) (citation omitted).

23.     The federal officer removal statute is to be broadly interpreted and liberally construed.  See Watson v. Philip Morris Co., Inc., 551 U.S. 142, 147 (2000); see also Papp, 842 F.3d. at 809 (3rd Cir. 2016); In re Asbestos Litig., No. 14-1190, 2016 U.S. Dist. LEXIS 75747, 2016 WL 3360703, at *2 (D. Del. June 10, 2016) ("the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." (quoting Arizona, 451 U.S. at 242 (1981))); In re Commw.'s Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila., 790 F.3d 457, 466-67 (3d Cir. 2015) ("Unlike the general removal statute, the federal officer removal statute is to be 'broadly construed' in favor of a federal forum." (quoting Sun Buick, Inc. v. Saab Cars USA, Inc., 26 F.3d 1259, 1262 (3d Cir. 1994))); see also

Willingham, 395 U.S. at 406 (1969) (noting that the scope of the federal officer removal statute "is not narrow or limited").

### i. Defendants Qualify As A Person

24.     As to the first element for removal, a corporation is a "person" within the meaning of section 1442(a).  Alsup v. 3-Day Blinds, Inc., 435 F.Supp. 2d 838, 845 FN3 (S.D. Ill. 2006); see Isaacson, 517 F.3d 129, 136.  As such, Defendants are a "person" within the meaning of 28 U.S.C. § 1442.

### ii. Defendants Acted Pursuant To Federal Officer Direction

25.     As to the second element for removal, an entity acts under a federal officer when it assists, or helps carry out, the duties or tasks of the federal superior.  Watson, 551 U.S. at 152. In other words, a special relationship must exist, such as where a party contracts with the Government to "provide a product that the Government was using during war – a product that in the absence of Defendants, the Government would have to produce itself."  See Isaacson, 517 F.3d at 137.  Close supervision of the private entity by the Government would constitute such a special relationship.  Id.  As noted above, as it relates to the allegations in this litigation, Defendants were in the business of assembly, overhaul, repair and maintenance of military vessels on behalf of the Navy in accordance with applicable military specifications.  See **Exhibit D** at ¶25.  This assembly and/or maintenance work was specified and overseen by the Navy and required the approval of the Navy at every stage of construction.  Id. at ¶¶26-29.  Therefore, Defendants acted pursuant to the direction of the Navy and accordingly, Defendants satisfy the second element for removal.

###### iii.    *Defendants Have Demonstrated That A Casual Nexus Exists*

26.    As to the third element of removal, a defendant must show that a causal nexus exists between the defendant's actions under color of federal office and the plaintiff's claims. Zeringue, 846 F.3d at 789.  When a government contractor builds a product pursuant to military specifications and is later sued because compliance with those specifications allegedly causes personal injuries, the causal nexus requirement is satisfied.  See Isaacson, 517 F.3d at 133-34; see also Fung, 816 F. Supp. at 572.   Here, Defendants have been sued for asbestos-related injuries purportedly relating to their construction of the USS Adams, USS Biddle and USS Lexington.  See **Exhibit A** at ¶10(d) and ¶10(n).  Therefore, it is "axiomatic" that Defendants have been sued in relation to conduct under color of its federal office, satisfying the "causal nexus" requirement.  See e.g. Vedros v. Northrup Grumman Shipbuilding, 2012 U.S. Dist. LEXIS 108871, 2012 WL 3155589 at *8 (E.D. Pa Aug. 2, 2012); Ruppel v. CBS Corp., 701 F.3d 1176, 1181 (7th Cir. 2012); Nesbiet, 399 F. Supp. 2d at 212-13; Crocker v. Borden, Inc., 852 F. Supp. 1322, 1327 (E.D. La 1994.)

27.    Defendants were acting under color of federal office when they operated as government contractors during the construction of the USS Adams, USS Biddle and USS Lexington.  During this time, Defendants performed their work pursuant to military contracts with the United States Government and in compliance with reasonably precise design specifications, as well as detailed design drawings, all of which were reviewed and approved by the Navy.  See **Exhibit D** at ¶25.  The Navy was intimately involved in the construction of the USS Adams, USS Biddle and USS Lexington and in all phases of design, development and construction of these military vessels.  Id. at ¶26.  The Navy monitored Defendants during their performance under the contract at all times.  Id. at ¶27.  The Navy required Defendants to work

on and construct the USS Adams, USS Biddle and USS Lexington in accordance with the applicable and approved products, specifications and drawings incorporated into the contracts. Id. at ¶28.   Accordingly, any asbestos-containing materials, equipment or parts used by Defendants in the construction of the USS Adams, USS Biddle and USS Lexington, were used pursuant to and mandated by specific requirements of the Navy.  Id. at ¶29.

### iv.    Defendants Have Colorable Federal Defenses

28.    As to the fourth element of removal under §1442, Defendants assert a number of colorable federal defenses, each of which is sufficient to support removal.  Defendants do not need to prove the merits of their defenses in order to remove this case; rather, they must present a colorable showing of entitlement to federal defenses such that the validity of the defenses should be tried in federal court.  As recently affirmed by this Court in Robert J. Kraus et al., v. Alcatel-Lucent, et al., 2:18-cv-02119-ER (E.D. Pa July 25, 2018 J. Savage):

> At the removal stage, the defendant need only show that the asserted Boyle defense is colorable, that it is legitimate and can reasonably be asserted, given the facts presented and the current law.  A court does not determine credibility, weigh the quantum of evidence or discredit the source of the defense at this stage. Instead, we only determine whether there are sufficient facts alleged to raise a colorable defense.

Id. at p. 7 (internal citations omitted);  see also, e.g., Mesa, 489 U.S. at 129; Corley v. Long-Lewis, Inc., 688 F. Supp. 2d 1315, 1334 (N.D. Ala. 2010); Ferguson v. Lorillard Tobacco Co., 475 F. Supp. 2d 725, 731 (N.D. Ohio 2007); Machnik v. Buffalo Pumps Inc., 506 F. Supp. 2d at 102-104; Nesbiet, 399 F. Supp. 2d at 210-11; Madden, 205 F. Supp.2d at 701; Pack v. AC and S, Inc., 838 F. Supp. 1099, 1103 (D. Md. 1993); Michael B. Donohue, et al., v. CBS Corporation, et al., 1:17-cv-07232-WHP, 2017 U.S. Dist. LEXIS 195159 (S.D.N.Y. November 27, 2017), attached hereto as **Exhibit E**.

29.     To make a colorable showing of their federal defenses, Defendants must show that their defense is "plausible" and not "completely frivolous." Magnin v. Teledyne Continental Motors, 91 F.3d 1424 at 1427 (11th Cir. Ala. 1996).  Defendants have met this burden.

### 1. *Defendants' Defense Under Boyle*

30.     The first colorable federal defense Defendants assert is the government contractor defense.  As set forth in the product-liability, design-defect context by the Supreme Court of the United States in Boyle, the government contractor defense applies when: (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.  Boyle v. United Techs. Corp., 487 U.S. 500, 512 (1988).

31.     To establish the defense in a failure-to-warn context, the elements are slightly modified to include a showing that: (1) the Navy exercised its discretion and approved certain warnings; (2) the defendant provided the warnings required by the Navy; and (3) the defendant warned the Navy about any hazards that were known by the defendant but not by the Navy. While Boyle expressly dealt with design defect cases, the government contractor defense is equally available in cases alleging injury from a failure to warn.  See Papp, 842 F.3d. at 813; see also In re Joint E. & S. Dist. N.Y. Asbestos Litig., 897 F.2d 626, 629-30 (2d Cir. 1990); Ripley v. Foster Wheeler LLC, 841 F.3d 207 (4th Cir. 2016); Smith v. Xerox Crop., 866 F.2d 135 (5th Cir. 1989); Perez v. Lockheed Corp., 81 F.3d 570, 576 (5th Cir.), modified on other grounds, 88 F.3d 340 (5th Cir. 1996) (per curiam); Winters, 149 F.3d at 401; Tate v. Boeing Helicopters (Tate II), 140 F.3d 654, 656 (6th Cir. 1998); Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 1003-

04 (7th Cir. 1996); <u>Snell v. Bell Helicopter Textron, Inc.</u>, 107 F.3d 744, 749-50 (9th Cir. 1997); <u>Dorse v. Eagle-Picher Indus., Inc.</u>, 898 F.2d 1487, 1489 (11th Cir. 1990).

32.    The government contractor defense has been applied in a variety of different situations involving different types of contractors.  <u>See, e.g.</u>, <u>Saleh v. Titan Corp.</u>, 580 F.3d 1, 5, 9, 388 U.S. App. D.C. 114 (D.C. Cir. 2009) (liability arising from military contractors' participation in combatant activities over which the military retains command authority); <u>In re World Trade Ctr. Disaster Site Litig.</u>, 521 F.3d 169, 197 (2d Cir. 2008) (coordination of "federal disaster assistance and streamlining the management of large-scale disaster recovery projects"); <u>Hudgens v. Bell Helicopters/Textron</u>, 328 F.3d 1329, 1334 (11th Cir. 2003) (maintenance of United States military aircraft according to procedures specified by the federal Government). The common thread of all these cases is that "the interests of the United States [would] be directly affected" by the imposition of liability on the contractor." <u>Boyle</u>, 487 U.S. at 507.

33.    Regarding the first two elements of the <u>Boyle</u> defense, Defendants have a colorable federal defense because the Navy provided Defendants with precise specifications about its construction of the USS Adams, USS Biddle and USS Lexington and Defendants built the vessels in a manner that conformed to those specifications.  <u>See</u> **Exhibit D** at ¶25. Additionally, the Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling, including any asbestos hazards.  <u>Id.</u> at ¶21. Defendants would not have been permitted, under the precise Navy specifications, to affix any type of warning through a label, tag, or other type of notice regarding asbestos to any equipment installed on a Navy ship or on the vessel itself, beyond those required or reviewed and approved by the Navy.  <u>Id.</u>

34.     As to the third element of the <u>Boyle</u> defense, as described below, the Navy's knowledge regarding the hazards of asbestos was superior to that of its military contractors. Moreover, the Navy had the singular unique access to controlled information as to its naval serviceman, the purpose of their military service, their stationing and their day-to-day operations that would cause such servicemen to come into contact with any potential harmful substances, including but not limited to asbestos.

35.     The Navy had superior knowledge about the potential hazards of asbestos exposure decades before Mr. Sullivan first served on a Navy vessel in 1968.  As early as 1922, the Navy recognized, as exemplified by its instructions to officers published in the <u>Navy Medical Bulletin</u>, the health hazards associated with airborne asbestos dust and the appropriate protective measures to prevent asbestos exposure.  <u>Id</u>. at ¶33.  Additionally, the Government passed the Walsh-Healey Public Contracts Act in 1936 requiring parties to significant Government contracts, including commercial shipyards, to provide safe work environments for employees engaged in the performance of that contract.   <u>Id</u>. at ¶34.

36.     The Navy also addressed asbestos safety measure in the 1939 <u>Handbook of the Navy Hospital Corps</u> and <u>Annual Report of the Surgeon General of the Navy</u>, including the identification of asbestos as a hazard.  <u>Id</u>. at ¶¶35-36.  During the early 1940s, the Navy specifically focused on potential asbestos exposures in shipyards and proscribed safety measures for handling asbestos.  <u>Id</u>. at ¶¶37-38.

37.     By 1943, the Navy, along with the Maritime Commission, demonstrated the superiority of their knowledge about asbestos hazards by declaring their responsibility for the safety and health of their workers.  In furtherance of that responsibility, they oversaw the implementation and staffing of safety and health programs for those workers by jointly issuing

"Minimum Requirements for Safety and Industrial Health in Contract Shipyards". Id. at ¶39. This document aligned the Government's expectation for private and contract shipyards with those already in effect and implemented at the Navy's own facilities. Id. The Navy continued to focus on potential shipyard hazards and prescribed safe work practices for asbestos dust in the 1940s and 1950s, especially the use of respiratory protection. Id. at ¶¶40-41.

38.    In 1951, the Walsh-Healey Act regulations expressly adopted "the values recommended by the American Conference of Governmental Industrial Hygienists . . . as a guide for allowable concentrations," including the 5 million particles per cubic foot threshold limit value for asbestos and use of control measures for reducing asbestos exposures. Id. at ¶42. The Navy's focus continued to be on the safety of shipyard workers, as represented by the inclusion of pipe covering as a "hazardous occupation" due to "asbestos exposure" in the 1954 Norfolk Naval Shipyard Safety Manual. Id. at ¶43. The Navy's goal of protecting human health was also emphasized in the 1955 Naval Institute publication called The Human Machine. Id. at ¶44 and Exhibit 12. In 1955, the Navy Bureau of Medicine also adopted the American Conference of Governmental Industrial Hygienists threshold limit value for Navy personnel. Id. at ¶45 and Exhibit 11.

39.    Given its superior knowledge about asbestos hazards, the Navy convened at the Boston Naval Shipyard a "Pipe and Copper Shop Master Mechanics' Conference" in 1957 to address concerns related to the pipefitters. Id. at ¶46. The conference was attended by personnel from all twelve Navy shipyards and the Navy's Bureau of Ships in Washington, D.C. and focused on safety for shipyard workers. Id. The Navy issued a Safety Handbook for Pipefitters in 1958 that explicitly addressed asbestos hazards and again set forth Navy policy for controlling these hazards. Id. at ¶47. The handbook stressed that "[a]sbestos dust is injurious if inhaled"

and warned those working with asbestos insulation materials to "[w]ear an approved dust respirator for protection against this hazard." Id.

40. Throughout the 1960s, the Navy continued to develop control measures and programs to protect workers from asbestos-related hazards. In October 1962, "Asbestosis" addressed the potential for exposure to asbestos aboard ships. Id. at ¶49. It concluded that "[t]he worker's best protection is to avoid careless creation of dusty conditions, use damp material when possible, and wear respiratory protection constantly." Id.

41. A December 9, 1968 Navy Memorandum enclosed a statement from the Bureau of Medicine ("BUMED") stating that the Navy was "well aware of the hazards of asbestos to its employees" and that "[h]azard control measures implemented by the shipyard medical departments and safety divisions are in accordance with accepted standards of industrial hygiene practices in the U.S." Id. at ¶50.

42. Throughout the 1970s, the Navy continued to disseminate information about asbestos hazards and best practices for protecting workers and servicemen. On February 9, 1971, the Commander of the Navy's Ship Systems Command issued to numerous Navy bureaus and commands its Instruction 5100.26 that prescribed "appropriate safety precautions during the use of asbestos" and it noted that "[t]he provisions in this instruction are considered as minimum health and safety requirements. More stringent restrictions may be applied by local commanders." Id. at ¶53. It then listed nearly fifty specific work practices to be employed to protect workers from asbestos exposure in handling or working in the vicinity of asbestos-containing products. Id.

43. Navy authorities also continued to promulgate a series of expansions and refinements of its program for addressing asbestos exposure to Navy personnel and implemented

studies and safety programs involving asbestos.  Id. at ¶¶54-55.  The Navy's historic knowledge about the hazards of asbestos was addressed in a November 13, 1978 statement to the House Subcommittee on Compensation, Health and Safety when Captain J.C. McArthur, U.S. Navy Commander from the Pearl Harbor Naval Shipyard addressed the asbestos hazards going back to the 1930s.  Id. at ¶56(a).  Accordingly, as outlined above, the Navy had superior knowledge of any asbestos hazards when compared to Defendants.

44.     General Dynamics has previously successfully removed asbestos personal injury cases to the United States District Courts for the Eastern District of Pennsylvania, in part, on federal officer grounds.  See Notice of Removal, Robert J. Kraus et al., v, Alcatel-Lucent, et al., 2:18-cv-02119-ER (E.D.Pa), annexed here to as **Exhibit F**.  In the Kraus matter, this Court denied the plaintiff's motion to remand.  See Order in Robert J. Kraus et al., v, Alcatel-Lucent, et al., 2:18-cv-02119-ER (E.D. Pa), annexed here to as **Exhibit G** at pp. 11-12.  Additionally, in General Dynamics has been held to be a government contractor entitled to the government contractor defense in other asbestos-related cases.  Boston v. Eastern Refractories Co., Inc., et al., 2:07-CV-63993-ER (E.D. Pa. MDL 875) (Order Granting General Dynamics Corporation's Motion for Summary Judgment, entered August 30, 2010).  A copy of the Court's Order Granting General Dynamics Corporation's Motion for Summary Judgment is annexed hereto as **Exhibit H.**  The bases for removal in this litigation under the government contractor defense are materially identical to these prior cases.

## 2. *Defendants's Defense Under Yearsley*

45.     Defendants are entitled to federal officer removal under 28 U.S.C. 1442(a)(1) based upon the separate and additional federal defense of derivative sovereign immunity as set forth in Yearsley v. WA Ross Construction Co., 309 U.S. 18 (1940).  "[U]nder Yearsley, a

government contractor is not subject to suit if (1) the Government authorized the contractor's actions and (2) the Government 'validly conferred that authorization, meaning it acted within its constitutional power." In re KBR, Inc., 744 F.3d, 326, 342 (4th Cir. 2014) (citing Yearsley, 309 U.S. at 20-21).   Defendants have derivative sovereign immunity here because the acts complained of were performed at the direction of Government officers, namely the Navy, acting pursuant to Government authorization, and if the Government had performed these acts directly, it would be immune from suit.

46.     In Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663 (2016), the Supreme Court made clear that the Yearsley immunity defense applies outside of the public works context so long as the contractor can demonstrate that it complied with the Government's specifications without regard to the subject matter of the contract. Id. at 673.  The Court expressly stated that "there is no liability on the part of the contractor who simply performed as the Government directed" as long as the authorization was validly conferred.  Id.

47.     The Campbell-Ewald Court also stated:

We disagree with the Court of Appeals to the extent that it described Yearsley as "establish[ing] a narrow rule regarding claims arising out of property damage caused by public works projects."  768 F.3d. at 879.  Critical in Yearsley was not the involvement of public works, but the contractor's performance in compliance with all federal directions.

Id. at 673 n.7.

48.     The defense of derivative sovereign immunity under Yearsley and Campbell-Ewald is a separate defense from the government contractor defense under Boyle.  In Campbell-Ewald, the defendant service contractor, a global advertising agency that contracted with the Navy to support its recruiting efforts, relied only on the Yearsley immunity defense at the district court level and made no mention of Boyle.  Plaintiffs' argument that defendant had to satisfy the

<u>Boyle</u> analysis was expressly rejected by the court on summary judgment.  <u>See</u> <u>Gomez v.</u> <u>Campbell-Ewald Co.</u>, 2013 U.S. Dist. LEXIS 34346, 2013 WL 655237, at *5 (C.D. Cal. Feb. 22, 2013), vacated, 768 F.3d 871 (9th Cir. 2014), aff'd, 136 S. Ct. 663(2016).   The defendant prevailed on <u>Yearsley</u> grounds because the Navy contracted with the defendant to obtain advertising-related services, and the defendant acted at the Navy's direction pursuant to those contracts.  <u>Id</u>.  The Court further found that the Navy worked closely with defendant on the offending text message recruiting campaign, providing oversight and approval, and reviewed, revised, and approved the text message itself.  <u>Id</u>. at *6.

49.     In <u>Cunningham</u>, the Fourth Circuit recently rejected an attempt to limit the scope of the <u>Yearsley</u> doctrine in a case where they solely considered the applicability of the doctrine.  <u>Cunningham v. General Dynamics Info. Tech.</u>, 888 F.3d 640, 645 n.2. (4th Cir. 2018).   The Court noted that <u>Yearsley</u> immunity derives from the Government's "unquestioned need to delegate governmental functions and the acknowledgment that imposing liability on private agents of the government would directly impede the significant governmental interests in the completion of its work." <u>Id</u>. at 643 (citations omitted).  In evaluating the first prong of the test, the Court concluded that the Government authorized the defendant's actions since it had adhered to the terms of the contract.  <u>Id</u>. at 648.

50.     Additionally, when analyzing the second step of the <u>Yearsley</u> immunity analysis, the <u>Cunningham</u> Court stated that the very purpose of this immunity is to "prevent a government contractor from facing liability for an alleged violation of law, and thus, it cannot be that an alleged violation of law per se precludes <u>Yearsley</u> immunity.   Consequently, we reject Cunningham's over inclusive interpretation of what constitutes a 'valid conferral' of authority under this prong."  <u>Id</u>.  The Court found that the defendant was entitled to derivative sovereign

immunity for the claim because the government authorized their actions and that authorization was validly conferred.  Id. at 649.

51.     Defendants are entitled to the derivative sovereign immunity defense because, as noted above, they (1) built the USS Adams, USS Biddle and USS Lexington, pursuant to contracts with the Navy, to execute the mission by building and servicing Navy vessels and any work on the construction of the vessel would have been in furtherance of the operation; and (2) the United States Government validly conferred its authorization of the construction of the USS Adams, USS Biddle and USS Lexington by an act of Congress.  Accordingly, Defendants have established their entitlement to removal under Yearsley and its progeny.  See In re World Trade Ctr. Disaster Site Litig., 521 F.3d at 196; Butters v. Vance Int'l, Inc., 225 F.3d 462, 466 (4th Cir. 2000); In re KBR, Inc., Burn Pit Litigation, 744 F.3d 326, 350-51 (4th Cir. 2014); Ackerson v. Bean Dredging LLC, 589 F.3d 196, 207 (5th Cir. 2009); Myers v. United States, 323 F.2d 580, 583 (9th Cir. 1963); and McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1343 (11th Cir. 2007).

### 3.  Defendants's Defense Under The "Combatant Activities" Exception

52.     Defendants are entitled to federal officer removal under 28 U.S.C. § 1442(a)(1) based upon the "combatant activities" exception of the Federal Tort Claims Act ("FTCA"). Generally, the FTCA permits suits against the Government for tortious acts of its employees. See 28 U.S.C. § 1346(b).  More specifically, the FTCA subjects the United States to liability in cases where injury is caused by the "negligence or wrongful act or omission of any employee of the Government" while acting in the scope of his or her employment in circumstances under which a private person would be liable.  See 28 U.S.C. § 1346(b).  However, the FTCA generally bars suit against the federal Government for claims "arising out of the combatant activities of the

military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j).  This is known as the "combatant activities exception."

53.     Courts have adopted an expansive definition of "combatant activity" as used in the FTCA, to "include not only physical violence, but activities both necessary to and in direct connection with actual hostilities."  Johnson v. United States, 170 F.2d 767, 770 (9th Cir. 1948). For example, in Harris, the Third Circuit held that the "maintenance of electrical systems at a barracks in an active war zone qualifies as integration into the military's combatant activities." Harris v. Kellogg, Brown & Root Servs., 724 F.3d 458, 481 (3rd Cir. 2013).  Similarly, courts have extended the definition to a company responsible for a latrine facility located on a "forward operating base" in Iraq as it provided "basic life support services for active military combatants on a forward operating base."  Aiello v. Kellogg, Brown & Root Services, Inc., 751 F. Supp. 2d 698, 701 (S.D.N.Y. 2011).

54.     As these cases make clear, the defense can apply to government contractors, like Defendants, where they are part of the combatant activities during a time of war.  Saleh v. Titan Corporation, 580 F.3d 1, 7-9 (D.C. Cir. 2009).  In addressing the extension of the combatant activities exception to contractors in Saleh, the D.C. Circuit relied on the Supreme Court's rationale in Boyle.  Saleh, 580 F.3d 1.  The Court focused on the risk-taking that is necessary in wartime efforts and noted that the traditional rationales of tort law, such as deterring risky behavior, compensating victims and punishing tortfeasors, are "singularly out of place in combat situations."  Id. at 7.  The Court then found that the combatant activities exception's underlying policy of eliminating tort liability from the battlefield is "equally implicated" whether the allegedly tortious act occurred at the hands of a soldier or a contractor that was engaged in combatant activities under military orders and command.  Id.  Accordingly, the Court extended

the combatant activities exception's protections to contractors when:  (1) they are integrated into combatant activities over which the military retains command authority; and, (2) the tort claim arises out of the contractor's participation in such combatant activities during a time of war.  Id. at 9.

55.     Other courts have reached similar conclusions to Saleh.  See e.g., Harris, 724 F.3d at 480  ("We adopt the D.C. Circuit's combatant-activities, command-authority test because it best suits the purpose of [the combatant activities exception]."); Aiello, 751 F. Supp. 2d at 710 ("This Court respectfully disagrees with the Koohi Court's formulation of the United States' interest in claims against military contractors arising out of combatant operations, and adopts the Saleh Court's formulation."); and Badilla v. Midwest Air Traffic Control Serv., 2017 U.S. Dist. LEXIS 59854, at *26 (W.D.N.Y. April 18, 2017) (applying Boyle to combatant activities exception in claim arising out of crash near Kabul).

56.     Here, Defendants have a colorable claim to a combatant defense because the activities on which Plaintiffs' claims are based arise out of activities undertaken in support of combat activities.  BIW constructed the USS Adams during the Vietnam War and for the purpose of supporting the Navy's wartime and/or active conflict activities.   General Dynamics constructed the USS Lexington during the Second World War under the direction of the Navy and for the purpose of supporting the Navy's wartime and/or active conflict activities. Accordingly, Defendants' activities were "combatant activities."  See e.g., Johnson, F.2d at 770 ("Aiding others to swing the sword of battle is certainly a 'combatant activity'….").  Additionally, Mr. Sullivan served on the USS Lexington between 1970 and 1972 and USS Adams between 1977 to January 10, 1980 when the United States was engaged in various

combatant activities, including the Vietnam War and the Cold War.[4]   Accordingly, Plaintiffs'

claim arose during "time of war."

57.     As described above, the use of any asbestos on the vessels was pursuant to its

Government contract, military specifications and under Navy oversight.  See **Exhibit D** at ¶¶25-

29.  The Navy's determination to use asbestos in building these ships during a time of war was

discretionary and incorporated myriad military concerns and issues, "which by their very nature

should be free from the hindrance of a possible damage suit."  Johnson, 170 F. 2d. at 769.

58.     Each of the foregoing colorable federal defenses outlined above supports

Defendants' removal of Plaintiffs' lawsuit to federal court.

## THIS CASE IS PROPERLY REMOVED

59.     A properly removed case cannot be remanded for discretionary or policy reasons,

such as allegedly related state court cases or a contention that judicial economy compels remand.

28 U.S.C. § 1447(c); Thermitron Products, Inc. v. Hermansdorfer, 423 U.S. 336 (1976).  The

federal officer removal statute is not narrow or limited, and it should not be frustrated by a

narrow or grudging interpretation of § 1442(a)(1).  Willingham, 395 U.S. at 405.

60.     Defendants are not required to notify and obtain the consent of any other

defendant in this action in order to remove Plaintiffs' action as a whole under § 1442(a)(1).  See

Humphries v. Elliott Co., 760 F.3d 414, 417 (5th Cir. 2014); See also Alsup, 435 F.Supp.2d at

842-843.

---

[4] Notably, while no "Vietnam war" was officially declared, courts that have found the term "time of war" does not
require an express declaration of war. See Koohi, 976 F.2d at 1333-1334, citing, Vogelaar v. United States, 665
F.Supp. 1295, 1302 (E.D. Mich. 1987); Rotko v. Abrams, 338 F. Supp. 46, 47 (D. Conn. 1971), aff'd, 455 F.2d 922
(2d Cir. 1972; Morrison v. United States, 316 F. Supp. 78, 79 (M.D. Ga. 1970).

## **CONCLUSION**

61.     Notice of Removal has already been provided as required by 28 U.S.C. §1442(a)(1).  Defendants join in the Notice of Removal.

62.     Defendants also provide Independent Notice of Removal pursuant to federal officer removal under 28 U.S.C. §§ 1441, 1442, 1446 and 1331.

63.     Should Plaintiffs move to remand this case, Defendants respectfully request an opportunity to respond more fully in writing, including the submission of additional affidavits and authority.

64.     Defendants reserve all of their defenses.

65.     As required by 28 U.S.C. § 1446(b), true and correct copies of the process and pleadings served upon Defendants are being filed with this Joinder of Removal and Independent Notice of Removal.

66.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Joinder of Removal and Independent Notice of Removal are being served on all parties and filed with the Clerk of the Court of Common Pleas of Philadelphia County.

**WHEREFORE**, Defendants BATH IRON WORKS CORPORATION and GENERAL DYNAMICS CORPORATION pray that this action proceeds in this Court as an action properly removed thereto.

Dated: Philadelphia, PA
August 30, 2018

Respectfully submitted,
**GORDON REES SCULLY MANSUKHANI, LLP**

By: /s/___Megan Bailey
Megan Bailey, Esq.
Erik C. DiMarco, Esq.
2005 Market St Suite 2900
Philadelphia, PA 19103
Phone: (215) 561-2300
mbailey@grsm.com
edimarco@grsm.com
Attorneys for Defendants
BATH IRON WORKS CORPORATION and
GENERAL DYNAMICS CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, counsel for BATH IRON WORKS CORPORATION and GENERAL DYNAMICS CORPORATION, hereby certify that a true and correct copy of the foregoing JOINDER OF REMOVAL AND INDEPENDENT NOTICE OF REMOVAL and supporting exhibits are being filed electronically through the Electronic Case Filing (ECF) system provided by the Court and shall be available for viewing and downloading from the ECF system by all counsel of record and to those registered to receive a Notice of Electronic Filing for this case on this 30th day of August, 2018.

/s/___Megan Bailey

Megan Bailey, Esq.